**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| ESTATE OF JAMES GIBSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:15-cv-01562-TWP-DML |
| | ) |
| CHEMTREAT, INC., GENERAL MOTORS, LLC, | ) |
| and CARAVAN FACILITIES MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

**ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on Motions for Summary Judgment filed pursuant to

Federal Rule of Civil Procedure 56 by Defendants Caravan Facilities Management, LLC,

("Caravan") (Filing No. 136), General Motors, LLC, ("General Motors") (Filing No. 141), and

ChemTreat, Inc. ("ChemTreat") (Filing No. 145). Following an explosion caused by a mix of

incompatible chemicals in a water tank at a General Motors plant, James Gibson was tragically

killed. Plaintiff, Estate of James Gibson ("the Estate") filed a Second Amended Complaint for

damages based on negligence and violation of the Indiana Product Liability Act. (Filing No. 67.)

Each of the Defendants denies liability and each has moved for summary judgment on the claims

against them. For the reasons stated below, Caravan's Motion for Summary is **granted** and

General Motors' and ChemTreat's Motions for Summary Judgment are **denied**.

# I. BACKGROUND

## A. The Estate's Surreply

As an initial matter, the Court notes that the Estate filed a Surreply on October 16, 2017

(Filing No. 175), and General Motors and ChemTreat have filed objections to the Surreply. (Filing

No. 176; Filing No. 184.) Local Rule 56-1(d) provides that "[a] party opposing a summary

judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." The Estate asserts that the Reply Briefs filed by each of the Defendants in support of their Motions for Summary Judgment contain either new evidence or objections regarding the admissibility of the Estate's evidence cited in the Estate's Response in Opposition to Summary Judgment, which justifies filing a surreply. (Filing No. 175 at 1.)

### 1. **ChemTreat's Objection**

ChemTreat argued in its Reply Brief that the Estate's Response Brief failed to comply with Local Rule 56-1 (b) because the Estate's Statement of Material Facts in Dispute spans twenty-five pages and contains "numerous statements that are neither material nor disputed for purposes of the present motion." (Filing No. 169 at 5.) ChemTreat contends that because of this failure the Court should strike the Estate's Statement of Material Facts in Dispute and accept ChemTreat's recitation of the facts. In response, the Estate explains that its Response in Opposition is lengthier because it combined its Responses against three the Defendants' Motions for Summary Judgment. Additionally, the Estate argues that ChemTreat has cited allegedly undisputed facts that the Estate contends are disputed without any citations to the record. ChemTreat replies that it did not object to the *admissibility* of any evidence in the record, but it did object to the Estate's statements of facts for procedural non-compliance with Rule 56-1 (b). Accepting ChemTreat's invitation to strike the Estate's recitation of the Material Facts in Dispute would mean that the Court would not consider a significant portion of the Estate's evidence. Even if the Court were to accept ChemTreat's framing of a technical, procedural flaw, the Court, in its discretion, would not strike the Estate's Statement of Material Facts in Dispute as proposed by ChemTreat.

Local Rule 56-1 governs summary judgment procedure and the parties' obligations in this District. Local Rule 56-1(b) requires the non-moving party to include in its response brief a section labeled "Statement of Material Facts in Dispute" that "identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." Local Rule 56-1(f)(1)(A) explains that "the court will assume that the facts as claimed and supported by admissible evidence by the movant are admitted without controversy except to the extent that the non-movant specifically controverts the facts in that party's 'Statement of Material Facts in Dispute' with admissible evidence." As noted by ChemTreat, the Estate's Response Brief includes the required "Statement of Material Facts in Dispute," but it largely fails to identify factual disputes and specifically controvert the facts put forth by the Defendants. The Estate's Statement is better described as a narrative of the events—beginning as early as 1999— leading up to the explosion on July 1, 2014, as opposed to identifying material factual disputes. The Court reminds counsel to follow proper summary judgment procedure, as it is not the Court's role to scour the record to find disputed issues of fact in response to summary judgment. However, despite the Estate's counsel's failure to identify and controvert specific issues of fact, there are still obvious disputes (contrary to what ChemTreat has termed as undisputed facts)—as expanded upon in the parties' arguments—that preclude summary judgment as it pertains to ChemTreat and General Motors.

ChemTreat also challenged an inference that one of its employees, Hank Pietras ("Pietras"), a chemical sales engineer, knew about the addition of the barrel pump at issue as speculation and conjecture to support the Estate's Theory of ChemTreat's knowledge.[1] Because

---

[1] It is undisputed that the barrel pump was a contributing factor in the explosion; however, the parties dispute who was ultimately responsible for the decision to use the barrel pump. This will be addressed in the merits of the Summary Judgment Motion Ruling.

ChemTreat objected to consideration of this inference on the basis of speculation, ChemTreat opened the door to the Estate's filing of a Surreply and ChemTreat may not now escape what follows from that objection. ChemTreat objects to the substance of the Surreply because it asserts that in pages 13 through 15 of the Surreply "the Estate offers new factual assertions and raises substantive arguments not articulated in its initial response." (Filing No. 176 at 2.) ChemTreat explains that the Estate's Response Brief focused only upon what Pietras knew, but in its Surreply the Estate now expands its argument to what Pietras should have known as well. As will be explained later in this ruling, the facts of this case foreclose ChemTreat's argument that the Estate's inference on Pietras' knowledge is pure speculation, as his job required him to be knowledgeable about chemical compatibility and others relied on his advice. Negligence law requires that a jury examine what the negligent party knew or should have known. *Smith v. Baxter*, 796 N.E.2d 242, 246 (Ind. 2003). While the Estate's Surreply makes a passing reference that what Pietras should have known is sufficient for a finding of negligence, much of the Estate's Surreply against ChemTreat focuses on Pietras' actual knowledge.

The Estate has properly used its Surreply to respond to ChemTreat's Reply Brief objections regarding the admissibility of the Estate's evidence and ChemTreat's objection is **overruled.**

### 2. General Motors Objection

The Estate's Surreply argues that General Motors has taken a new factual position that the Hazardous Materials Control Committee ("HMCC") is not a "GM entity". The parties fully briefed their dispute about HMCC, a cross-functional committee, in the summary judgment briefings. In both General Motors' Motion for Summary Judgment and Reply, General Motors maintained that Quaker Chemical Corporation ("Quaker") led the HMCC meetings and that HMCC was a cross-functional committee. Specifically, in General Motors' Reply it took issue

with the Estate referring to HMCC as "GM HMCC".  (Filing No. 184 at 2.)  General Motors did not cite new evidence regarding the HMCC.  Therefore, the Court will disregard Section II.4 of the Estate's Surreply.  The fact that General Motors did not cite new evidence regarding the HMCC is bolstered by the fact that the Estate devoted one paragraph to an allegedly new factual position in its Surreply.

In its Reply General Motors objects to the consideration and use of the Call to Action Report ("Call to Action Report") and Fatality Report to the extent the report discusses remedial measures.  (Filing No. 172 at 2.)  This document contains both an assessment of circumstances that led to the accident and action items moving forward.  (Filing No. 165-31.)  The action items contain references to which policies and procedures were violated as well as remedial measures.  *Id.* at 4.  One of the highly contested issues is whether or not HMCC was required to review new usage of existing chemicals.  Relatedly, General Motors' control over HMCC (which had final approval of chemical use) is also highly contested.  Although the Call to Action Report contains some remedial measures, the Court will admit the Call to Action Report in its entirety because it refers to policies and procedures in effect at the time of the accident regarding HMCC approval for new use of existing chemicals and General Motors' extent of control over HMCC.  Consistent with Federal Rule of Evidence 407, to the extent that the Call to Action Report refers to subsequent remedial measures, such evidence cannot be used to prove negligence or culpable conduct; rather it is admitted to prove the disputed issue of HMCC's approval process and General Motors' control of HMCC.

General Motors' Objection to Section II.4 of the Estate's Surreply is **sustained**, and the Surreply on this issue is will not be considered by the Court.  General Motors' Objection to Section II.3 is **overruled,** and the Surreply will be considered by the Court as to this section.

**B.**     <u>**Statement of Material Facts**</u>

The following material facts are not in dispute and are viewed in a light most favorable to the Estate as the non-moving party. *See Luster v. Ill. Dep't of Corrs.,* 652 F.3d 726, 728 (7th Cir. 2011). James Gibson ("Gibson") was killed following a tragic explosion at General Motors' Marion Metal Stamping Plant located in Marion, Indiana ("the Plant") on July 1, 2014. Gibson worked for Quaker, an independent contractor of General Motors. He was a Quaker employee and his title was Site Manager. Quaker contracted with ChemTreat,[2] a water treatment company, to monitor the performance of water treatment systems within the welder water system at the Plant, and to make recommendations on products to use. ChemTreat employee, Pietras, visited the Plant approximately twice each month to "(1) track ChemTreat inventory on site, (2) collect and analyze water samples, (3) evaluate performance of ChemTreat's chemical program, and (4) make chemical water treatment program recommendations for improving performance and system conditions." Caravan provides building maintenance services to the Plant.[3]

The explosion at issue in this case occurred in the welder water system. The welder water system has two systems that work together to cool the welding tools in the Plant: a closed loop welder water system and an open cooling tower system. Attached to the open cooling tower system is a brominator. The brominator's operating manual contains a cautionary warning that the use of chemical products other than "BCDMH" "could cause a chemical reaction leading to excessive pressurization of the brominator tank, creating an explosion of the vessel, causing death, serious bodily injury, or property damage." ([Filing No. 165-32 at 3](#).) C2188, one of the chemicals involved in the chemical reaction which caused the explosion, was used in the open cooling tower

---

[2] ChemTreat is considered a "Tier 2" supplier because it is a subcontractor of Quaker. Quaker is a "Tier 1" supplier as it contracts directly with General Motors.

[3] General Motors contracted with Caravan to perform all necessary building maintenance.

system to treat the water on a regular basis.  (Filing No. 142 at 3.)  C2188 is manufactured and supplied by ChemTreat.  *Id.*

On December 11, 2013, General Motors employee, Matt Emery ("Emery")[4] approached Gibson about finding an alternative use for the remaining unused Onyxide 200 ("Onyxide"), a biocide chemical.  (Filing No. 166 at 17.)  Gibson then contacted ChemTreat employee Pietras via email and the following email exchange occurred:

> Hank, I have a quantity of biocide I need to use up by the end of the year. It is Onyxide 200 and is equivalent to Grotan. Is it safe, possible and reasonable to put this biocide in the WW loop or Cooling Tower? What other information do you need to explore this option? Would this contribute to the TOC level in the WW loop? . . . Please respond as quickly as possible—I have to answer this question soon.

(Filing No. 165-28 at 2-3).  Pietras responded,

> I would put them in the Tower system because we can blow that system down, we don't have to worry about any concentrating affect. Let's not mess with the WW loop, as it is in the best shape it has been in twenty years!

*Id.*  Gibson then asked,

> How about the dosage?  Use kill dose as recommended by the manufacturer. I think it is 1500 ppm.

*Id.*  Pietras answered,

> That would be good, but that could be about 20-30 gallons depending on how you [] have, you could just do doses of 5-10 gallons. Maybe you just want to add it all at once and get rid of it though.

*Id.*  Pietras admits that he did not consult the Material Safety Data Sheets ("MSDS") on the chemical compatibility of Onyxide 200 and C2188 (the chemical already in the open cooling tower system) before making his recommendation to Gibson.  (Filing No. 147-5 at 39-40.)  The MSDS identifies C2188 as an oxidizer and flags Onyxide 200 as a risk to react with oxidizers; thus, the

---

[4] Emery has basic oversight of the chemical management program ensuring that Quaker carries out its responsibilities under General Motors' contract with Quaker.

MSDS warned of the risk of a chemical reaction between the two chemicals at issue. Having received Pietras' recommendation, Gibson reported back to Emery that Onyxide could be reused as another biocide. (Filing No. 147-2 at 58-59.) Emery and Gibson concluded that Onyxide did not need to be presented to HMCC for approval. "So since it was a biocide that we were using previously, you can use as another biocide, we did not see that as a need to reapprove the chemical because it was being used as a biocide." (Filing No. 147-2 at 33.)[5] It is undisputed that the use of *new* chemicals must be approved by HMCC, but the parties dispute whether or not *new uses of existing chemicals* were required to be approved at the time of the explosion and who was responsible for ensuring HMCC approval was sought.

After receiving Pietras' response that Onyxide could be used in the welder water cooling tower and reporting back to Emery, Gibson then instructed Quaker employee, Jordan Tharp ("Tharp") to introduce Onyxide into the open cooling tower system. Initially, Tharp used a pump that was used previously to pump a different chemical, but noticed that the Onyxide was being pumped into the system at an extremely low rate because it was too viscous and thick for the pump and hose. (Filing No. 166 at 22.) Tharp reported the pumping problem to Pietras and Gibson. (Filing No. 147-5 at 40; Filing No. 166 at 22.) It was at this point that Defendant Caravan was brought into the series of events, because the installation of a new pump required pipe fitting work that only Caravan could perform. (Filing No. 166 at 22-23.) Gibson discussed the need for a pump that could handle a larger volume of Onyxide with General Motors employee Emery who places orders through General Motors' work request system. *Id.* Gibson located the Lincoln barrel pump he wanted to use from a stock of existing pumps and Emery placed the order for the pump installation with Caravan employee Robert Ogden ("Ogden"). *Id.* Ogden knew the pump would

[5] The parties dispute whether or not the new use of Onyxide was required to be presented and approved by HMCC and who had ultimate responsibility to present the new use to HMCC.

be installed upstream of the brominator; however, Ogden and Gibson never discussed the flow capacity of the Lincoln barrel pump. *Id.* Caravan employee Sam Fanning ("Fanning") installed the Lincoln barrel pump without connecting it to the Onyxide drum on June 12, 2014. ([Filing No. 137 at 11.](#)) Fanning left the pump shut off and accessible and set the air pressure to 0 so that Gibson could set the specification and then start pumping. *Id.*

On July 1, 2014, an explosion occurred in the water tank and Gibson was killed. ([Filing No. 142 at 12.](#)) The General Motors' Fatality Report identified a combination of factors and root causes that led to the explosion which created a chemical reaction between incompatible chemicals Onyxide 200 and C2188. ([Filing No. 138-10 at 9.](#)) The installation of the Lincoln barrel pump which introduced Onyxide upstream of the brominator and increased the rate of flow of the chemical into the system by four times were found as root causes. *Id.* Additionally, lack of HMCC approval for the new use of Onyxide in the cooling tower system was identified as a contributing factor. *Id.*

## II.  LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). "In much the same way that a court is not required to scour the record in search of evidence to defeat the

motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). "[N]either the mere existence of some alleged factual dispute between the parties . . . nor the existence of some metaphysical doubt as to the material facts . . . is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III. <u>DISCUSSION</u>

Common law negligence claims require the plaintiff to show: (1) the defendant owed a duty to the plaintiff, (2) breach of duty in not fulfilling the applicable standard of care, (3) the breach of duty proximately caused the plaintiff's injury. *Caesar's Riverboat Casino, LLC v. Kephart,* 934 N.E.2d 1120, 1123 (Ind. 2010). "Absent a duty, there can be no breach, and therefore, no recovery in negligence." *Merchants Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.,* 741 N.E. 2d383, 386 (Ind. Ct. App. 2003). "Although summary judgment is generally inappropriate in a negligence case, it may be appropriate if the defendant demonstrates that undisputed facts negate at least one element of the plaintiff's claim." *Straley v. Kimberly*, 687 N.E. 2d 360, 364 (Ind. Ct. App. 1998) (citation omitted). The Court will discuss Caravan's, General Motors', and ChemTreat's summary judgment motions in turn.

### A. <u>Caravan</u> ([Filing No. 137](#))

Caravan argues that it had no duty, breached no duty owed to Gibson, and did not proximately cause the explosion which resulted in Gibson's death. "The existence of a duty is a question of law for the court to determine." *Rawls v. Marsh Supermarket, Inc.,* 802 N.E.2d 457, 459 (Ind. Ct. App. 2004). In the absence of a statutory or clearly established duty, Indiana courts balance three factors to determine if a duty exists at common law. *Steele v. Maren Engineering*

*Corp.,* 460 F. Supp.2d 877, 881-82. "The three factors to be balanced include the relationship between the parties, the reasonable foreseeability of harm, and public policy considerations." *Id.* (discussing the three-pronged test from *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind. 1991)).

The Estate's argument that Caravan breached its duty of reasonable care surrounds Caravan's maintenance of the brominator and the installation of the Lincoln barrel pump upstream of the brominator. The Estate explains if Caravan had maintained the brominator in accordance with the brominator's operator's manual or alerted Gibson to the cautionary warnings about potential explosions when using other chemical products in the system then it is reasonably likely Gibson would have not added the Onyxide to the system or found another location for the pump. ([Filing No. 166 at 31-32.](#))

Caravan's responsibilities and scope of work at the Plant are defined in the Service Agreement between General Motors and Caravan. Gibson's employer, Quaker, is not a party to this contract. Quaker would submit requests to Caravan for maintenance tasks through General Motors' work request system. The Estate tries to get around the first *Webb* factor, *i.e.* the lack of a contractual relationship between Caravan and Quaker, by crafting an argument that Caravan knew of the danger via the brominator's cautionary warning and took no action to warn Gibson of it in breach of a duty to warn. However, this argument is defeated on the foreseeability factor because it is undisputed that Caravan provided manual labor and maintenance tasks, but this did not include knowing how chemicals would react within the system. "[U]nder Indiana law the knowledge of a danger necessary to create a duty to warn must be knowledge that a defect exists in the manner in which the machine is operating." *Id.* Although the Estate alleges that Caravan was negligent in placing the Lincoln barrel pump upstream of the brominator, the Estate has not alleged that the pump was defective or was damaged during installation. It is undisputed that

Caravan had no subject matter knowledge of chemicals and how they might react after Caravan installed its part on any given work request. Chemical analyses fell within the scope of work provided by Quaker and ChemTreat. At most, Caravan understood and helped select a pump that would sufficiently pump the Onyxide, but it is undisputed that Caravan did not discuss flow capacities of the various pump options and had no real understanding on how the flow rate of the barrel pump would affect the chemical properties of any of the chemicals.

Because the machine did not operate defectively and Caravan lacked subject matter knowledge regarding chemicals, Caravan's failure to alert Gibson to the brominator's cautionary warning did not create the type of relationship necessary for a common-law duty to exist. The same reasoning applies as to why Gibson's injury was not foreseeable to Caravan. Foreseeability examines "whether the person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable. *Webb*, 575 N.E.2d at 517. Gibson was a foreseeable victim, however because it is undisputed that Caravan had no understanding or involvement regarding chemical contents of the welder water system, the type of harm that occurred as a result of the explosion was unforeseeable to Caravan. Finally, it would be against public policy to hold a business liable under circumstances where the decision to install a large volume pump was dictated to Caravan by Quaker, and every action involved in adding the chemicals at issue and adjusting the air pressure of the pump was also made by the subject matter experts (Quaker and ChemTreat). The Court finds that a lack of a relationship between the parties and public policy concerns weigh against finding a duty in this case.

Even if the Court found that Caravan had breached a duty owed to Gibson during the installation of the pump or maintenance of the brominator, Caravan's actions did not proximately cause Gibson's death. "In determining whether an act is the proximate cause of another's injury,

this court considers whether the injury was a natural and probable consequence of the negligent act, which in light of the attending circumstances, could have been reasonably foreseen or anticipated." *Straley,* 687 N.E.2d at 365 (citation omitted). Courts have found intervention of an independent, superseding negligent act to relieve the original negligent actor of liability when that act could not have been reasonably foreseen. *Id.* (holding that the gas company's actions broke the chain of causation when it took several unforeseeable intervening, negligent acts and that the defendants could not have reasonably foreseen such acts sufficient for a proximate cause finding).

As stated previously, Caravan's installation of the pump upstream of the brominator and maintenance of the brominator were contributing factors in the explosion. However, Gibson's death from the resulting mixture of incompatible chemicals intensified by a large volume pump and upstream placement would simply be unforeseen to Caravan due to the relative knowledge of the parties.

*Straley* is instructive here. In that case, the Indiana Court of Appeals held that the excavator's contributing, negligent act in not clamping a gas line was superseded by the gas company's negligence in attempting to fix a major gas leak without turning off the gas. *Id.*

> Furthermore, we find that assigning legal liability to the defendants would be inconsistent with the policy underlying proximate cause. In the present case, the defendants called the gas company because it alone had the experience and expertise to make the necessary repairs and to diminish the dangerous situation created by the gas. Further, the explosion did not occur until one hour after the gas company had assumed **control** of the site. To hold the defendants liable of [] injuries would make them responsible for actions and events which were beyond their **control** and make them guarantor's of a gas employee's safety. Therefore, we conclude that, as a matter of law, the defendants were not the proximate cause of [] injuries.

*Id.* (emphasis in original). Similarly to *Straley*, both ChemTreat and Quaker, as the chemical management subject matter experts, had the experience and expertise to assess chemical compatibility and how the flow rate of an upstream pump placement would impact the interaction

of those chemicals. Caravan, as a provider of manual labor, had no experience or expertise on chemical properties. Further, Quaker's control over the welder water cage at the time of the explosion is also present. Whereas in *Straley*, the intervening, negligent actor had assumed control of the site for one hour before the explosion, Quaker had assumed control of the welder water cage for approximately three weeks and made adjustments for the pump's use. The evidence reveals that the pump was installed on June 12, 2014, and the explosion occurred on July 1, 2014. ([Filing No. 138-10 at 7](#).) Additionally, only Quaker and General Motors had access to the welder water cage which was kept locked at all times. Caravan, as a matter of law, was not the proximate cause of Gibson's death.

The evidence in the record shows that the barrel pump was installed according to Gibson's directions, and thereafter he adjusted the air pressure of the pump to his own specifications. The evidence also shows that Quaker had control over the welder water cage for approximately three weeks before the explosion and the superseding action of the mixture of incompatible chemicals. Even if Caravan had breached a duty of reasonable care, summary judgment is still appropriate because of lack of causation. Therefore, Caravan's Motion for Summary Judgment ([Filing No. 136](#)) is **granted**, and the Estate claims against Caravan are **dismissed with prejudice**.

**B.** **General Motors** ( [Filing No. 142)](#)

General Motors' liability is based on a premises liability theory of negligence. General Motors argues that it had no duty, breached no duty owed to Gibson, and did not proximately cause the explosion which resulted in Gibson's death. "In premises liability cases, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred. The rationale is to subject to liability the person who could have known of any dangers on the land and therefore could have acted to prevent any foreseeable harm." *Rhodes v.*

*Wright,* 805 N.E.2d 382, 386 (Ind. 2004). The law presumes no duty arises in the case of independent contractors due to plant owners adhering to the independent contractor relationship in not exercising control over the manner and means of the contractor's work. *See Hunt Const. Group, v. Garrett,* 964 N.E.2d 222, 228-29 (Ind. 2012) ("As a general rule, an owner of property has no duty to provide independent contractors with a safe workplace.") (citation omitted). The Indiana Supreme Court has recognized other exceptions to this general rule of no liability in the independent contractor context.

> A principal (the general contractor) is not liable for the negligence of an independent contractor (the sub) unless one of the five exceptions applies. As stated in *Bagley* these are
>
> (1) where the contract requires performance of intrinsically dangerous work;
> (2) where the principal is by law or contract charged with performing the specific duty;
> (3) where the act will create a nuisance;
> (4) where the act to be performed will probably cause injury to others unless due precaution is taken;
> (5) where the act to be performed is illegal.

*Helms v. Carmel High School Vocational Building Trades Corp.,* 854 N.E.2d 345, 346 (Ind. 2006). These five exceptions create non-delegable duties. *Bagley v. Insight Communications, Co., L.P.,* 658 N.E.2d 584, 588 (Ind. 1995). Independent contractors are deemed business invitees to which the possessor of the land will not be liable for physical harm caused to them by any activity or condition of the land if the danger is known and obvious to the business invitee. *See Myers v. Bremen Casting, Inc.,* 61 N.E.3d 1205, 1217 (Ind. Ct. App. 2016).

The Court will examine the duty from the control analysis as well as the second non-delegable exception iterated above as the Estate argues that General Motors owed a legal duty in three ways. The Estate argues that: 1) General Motors had control of the design and maintenance of the equipment in the welder water cage; 2) federal law charged General Motors to perform

safety assessments as the Plant owner; and 3) General Motors' contract with Quaker tasked General Motors with final approval for the new use of chemicals through the HMCC.[6]

The Estate's first argument is based on Caravan's installation of the pump and maintenance of the brominator. Having concluded that Caravan was not negligent in maintaining the brominator nor installing the pump, the Court reaches the same finding regarding General Motors' negligence as a result of the configuration of the welder water equipment including the installation of the pump. Other than putting in a work order at the request of Gibson, General Motors played virtually no role in selecting the pump as Gibson was the point of contact for Caravan in selecting the pump and throughout installation. Regarding the Estate's control arguments, General Motors did relinquish most of its control over the chemical management program to Quaker; however, a genuine, material factual dispute exists as to whether General Motors controlled HMCC and if HMCC was required to approve new *uses* of existing chemicals. It is undisputed that HMCC is responsible for final approval of new chemicals.

General Motors argues that it did not have any control over Gibson's addition of Onyxide because it was already approved for use as a biocide and was not required to go through HMCC review. General Motors also argues its contract with Quaker requires Quaker, in its sole discretion, to ensure that a chemical review occurs by submitting a request to HMCC. Finally, General Motors contends that HMCC is not a General Motors' entity, but a cross-functional committee that Quaker was charged with leading.

The Estate responds that ultimate approval for use of a chemical rested with General Motors through the HMCC which General Motors controlled (Filing No. 166 at 34). Although Quaker is on the committee, the Estate contends that Quaker does not approve any chemicals

---

[6] This issue is also related to General Motors' control of Quaker's contract work.

because General Motors and United Auto Workers union members specifically evaluate and thus approve new chemicals for safety. (Filing No. 166 at 7.) The Estate relies on the Hazardous Materials Control Program which requires that any approved chemical material proposed for a new use must be reviewed by the HMCC in support of its argument that Onyxide should have been presented to HMCC for review. The Estate argues that General Motors controls HMCC because General Motors' employee Emery presides over the HMCC. Emery concedes in his deposition that he and Gibson both agreed that Onyxide did not need to be presented to HMCC because it was not a new chemical; rather, it was a new use of an existing chemical. (Filing No. 147-2 at 33.)

The Court finds that the disputed facts are material to the questions of whether General Motors retained control for final approval of chemicals through HMCC, including the new use of existing chemicals. At the summary judgment stage, the Court must view the evidence in a light favorable to the Estate as the non-moving party. In order for General Motors to maintain no liability based on the presumption that plant owners generally owe no duty to independent contractors, it must show that it did not control the manner or means of Quaker's work under the chemical management program. Subjecting Quaker, the chemical manager contractor, to seek and obtain final approval on chemical uses from HMCC, an alleged General Motors entity, would be a significant restriction on the independent contractor relationship between General Motors and Quaker. The Court cannot determine, as a matter of law, that General Motors owed no duty to Gibson. As it relates to General Motors, the duty question presents a mixed question of law and fact. "Whether a duty exists is generally a question of law for the courts to decide, but the existence of a duty sometimes depends on underlying facts that require resolution by the trier of fact." *Pelak v. Indiana Industrial Services, Inc.* 831 N.E.2d 765, 773 (Ind. Ct. App. 2005) (citation omitted). Having concluded that General Motors' control of HMCC would lend to a duty because General

Motors would then control the "manner or means" that Quaker performs under the contract, the Court declines to discuss if General Motors had a non-delegable duty under the Indiana exceptions[7] which necessarily involves the same factual disputes and issues.

General Motors argues that the relative knowledge of the parties provides another basis for summary judgment because Gibson possessed superior knowledge regarding chemical compatibility. "The comparative knowledge of a landowner and an invitee . . . is not a factor in assessing whether the landowner owes a duty of care; rather, such a fact is relevant in assessing whether the landowner breached its duty. *Myers*, 61 N.E.3d at 1217. General Motors buttresses the fact that it had no knowledge of chemical compatibility with the fact that it had no control over how Quaker and ChemTreat managed the chemical composition in the welder water cage. However, this is challenged by the Estate's disputed fact that General Motors had control of HMCC which had final approval over chemicals used. Further, it was Emery—presiding member of the HMCC—who asked Gibson to look into using the unused Onyxide in the welder water system. Because Emery concedes in his deposition that both he and Gibson decided not to present the introduction of Onyxide 200 to HMCC and there is a factual dispute about whether new uses of existing chemicals should have been presented to HMCC, General Motors has not sufficiently negated the element of proximate cause for a grant of summary judgment in its favor. The Estate also argues that Federal OSHA regulations required General Motors to perform safety assessments as the plant owner; however, these regulations apply to employer/employee relationships and Gibson was not a General Motors employee. 29 C.F.R. § 1910.1 (a).[8] It could have reasonably

---

[7] The nature of the Estate's Response Brief lends to an application of the second *Helms* exception ("where the principal is charged by law or contract with performing the specific duty"), but the Estate does not explicitly mention the exceptions in argument. *Helms,* 854 N.E.2d at 346.
[8] This is based on the second Helms exception "charged by law." *Helms,* 854 N.E.2d at 346.

been foreseen that failure to present the introduction of Onyxide into the welder water system could proximately cause a catastrophe or endanger human health which is exactly what happened.

At the summary judgment stage, the Court must view the evidence in a light favorable to the Estate as the non-moving party. Factual disputes exist regarding HMCC's required approval over new uses of existing chemicals and if it was in fact controlled by General Motors. There is also a factual dispute as to who had responsibility to present Onyxide to HMCC under General Motors' practices and procedures at the time of the explosion. These factual disputes are determinative on the elements of duty, breach, and proximate cause. The Court cannot conclude at this stage that General Motors is entitled to judgment as a matter of law. Therefore, the Court **denies** General Motors' Motion for Summary Judgment (Filing No. 141).

## C.    **ChemTreat** (Filing No. 145)

ChemTreat argues that it did not owe a clearly established duty to Quaker nor did it owe a duty under the *Webb* factors. As the Estate points out, there are various legal doctrines that create a duty for ChemTreat under the circumstances of this case including the *Webb* factors. ChemTreat attempts to argue that only the *Webb* factors can serve as a source of duty under the circumstances of this case to make the point that the *Webb* factors only provide for a duty where "a defendant exercises sufficient control over the instrumentalities or activities causing injury to warrant imposing a duty to prevent foreseeable risks." ChemTreat premises its argument that it owed no duty to Gibson based on ChemTreat's lack of control and knowledge regarding the selection of the barrel pump, *i.e.* the manner in which the Onyxide was introduced into the system, largely ignoring the advice that ChemTreat employee Pietras gave Gibson that incompatible chemicals were compatible and that Onyxide could be introduced all at once. This is flawed reasoning for two reasons. First, although ChemTreat would likely owe a duty under the *Webb* factors, the Court

need not address the *Webb* factors in the presence of a "clearly established duty," which is present in this case. "It is unnecessary for us to perform the *Webb* analysis because our supreme court and this court have already held that contractors performing work owe a duty to third persons rightfully on the premises." *Horine v. Homes by David Thompson, LLC,* 834 N.E.2d 680 at n.3. Second, it is undisputed that the barrel pump increased the flow of the Onyxide contributing to the explosion, but it is also undisputed that Gibson vetted the safety and rate of introducing Onyxide into the welder water system with Pietras before taking any action. Thus, ChemTreat ignores both its role and indirect contribution in the selection of the barrel pump and the initial decision to introduce Onyxide into the welder water system.[9]

As mentioned previously there are multiple legal doctrines creating ChemTreat's duty in this case, but the most relevant duty is the duty created by an "assumption of duty". "Indiana recognizes the imposition of a duty to exercise care and skill upon one who by affirmative conduct assumes to act, even gratuitously, for another. The assumption of a duty creates a special relationship between the parties and a corresponding duty to act in a reasonably prudent manner." *Lamb v. Mid Indiana Service Co., Inc.,* 19 N.E.3d 792, 794 (Ind. Ct. App. 2014) (citation omitted). Much of ChemTreat's argument and case law cited focuses on applying the *Webb* factors.

Here, ChemTreat, as Quaker's subcontractor and sales engineer, provided Quaker subject matter expertise on water treatment for the welder water system. As part of this business relationship, ChemTreat employee Pietras visited the Plant every two weeks and regularly prepared and distributed written reports containing his analysis results and recommendations for microbiological control of the water in the welder water cooling system. (Filing No. 147-5 at 21-22.) Pursuant to ChemTreat's ongoing and periodic technical services, it sent an invoice for

---

[9] ChemTreat also relies on material, disputed facts in its Motion for Summary Judgment.

$3,000.00 to Quaker each month[10] (Filing No. 165-26). ChemTreat assumed the duty to provide water treatment subject matter expertise and was compensated under the contractual agreement between Quaker and ChemTreat. In fact, ChemTreat's proposal provided that, "[i]n addition to routine evaluation of chemical applications and feed equipment, our program will include, at no additional charge, specific services designed to improve applications." (Filing No. 165-13 at 9.) The proposal also stated, "[e]ducation, training, and experience are needed to make sound technical recommendations in all phases of industrial water treatment" after laying out Pietras' qualifications. From the foregoing facts, it is clear ChemTreat affirmatively assumed a duty when it entered a contract to serve as Quaker's subject matter expert on water treatment for the welder water system.

Next, it is clear that there was a breach of ChemTreat's duty based on Pietras' email and recommendation to Gibson. The email exchange is repeated here:

> Hank, I have a quantity of biocide I need to use up by the end of the year. It is Onyxide 200 and is equivalent to Grotan. Is it safe, possible and reasonable to put this biocide in the WW loop or Cooling Tower? What other information do you need to explore this option? Would this contribute to the TOC level in the WW loop? . . . Please respond as quickly as possible-I have to answer this question soon.

(Filing No. 166 at 18.) Pietras responded,

> I would put them in the Tower system because we can blow that system down, we don't have to worry about any concentrating affect. Let's not mess with the WW loop, as it is in the best shape it has been in twenty years!

*Id.* Gibson then asked,

> How about the dosage? Use kill dose as recommended by the manufacturer. I think it is 1500 ppm.

*Id.* Pietras answered,

---

[10] ChemTreat billed separately for ChemTreat's chemicals that Quaker had access to use in the welder water system.

That would be good, but that could be about 20-30 gallons depending on how you [] have, you could just do doses of 5-10 gallons. Maybe you just want to add it all at once and get rid of it though.

*Id.* Pietras concedes in his deposition that he did not consult the MSDS before advising Gibson on introducing Onyxide 200 into the welder water system. (Filing No. 147-5 at 39-40.) The MSDS flagged the risk of a chemical reaction between Onyxide 200 and C2188 (the chemical already in the open cooling tower). Pietras' failure to consult the MSDS before answering Gibson's question was a breach of ChemTreat's duty. When asked about the dosage, Pietras, at a minimum, implied that Gibson could add it all at once. Relying on this information, Gibson mixed incompatible chemicals and asked Caravan to provide and install a large volume pump that would introduce the Onyxide 200 at an increased rate of flow up to four times faster.

ChemTreat narrowly defines the proximate cause of the explosion focusing on the manner and process that Onyxide was introduced through the selection and installation of the Lincoln barrel pump. ChemTreat argues that it was not involved in this process at all nor provided input. This is also a disputed fact. The Estate argues that Pietras had actual knowledge that a new larger volume pump was going to be used to introduce Onyxide into the system. "Lastly, while ChemTreat may not have installed the pump Mr. Gibson was using, Pietras was well aware of the fact that the existing pumps were not working and that a new pump was going to be used in order to increase the flow and he failed to warn about the potential danger." (Filing No. 166 at 30.) ChemTreat responds that it did not have actual knowledge that the Lincoln barrel pump would be used and that there was only one isolated email exchange between Gibson and Pietras about introducing Onyxide into the system. This assertion is contradicted by the evidence in the record for two reasons. First, Pietras acknowledges having a different conversation about pump issues

with Quaker employee Tharp;[11] therefore, the email exchange was not the only isolated conversation that took place between Quaker and ChemTreat regarding the introduction of Onyxide 200 into the system. (Filing No. 147-5.) In fact, the Estate alleges that Pietras frequently went to lunch with Tharp and Gibson during Pietras' visits where they discussed the introduction of Onyxide into the cooling tower and pump issues subsequent to the email exchange but before the installation of the Lincoln barrel pump. (Filing No. 166 at 21.) Second, Quaker employees interpreted Pietras' email (and the Court agrees) stating "maybe you just want to add it all at once" in response to Gibson's question regarding dosage recommendations as giving a green light on using a large volume pump that would allow as much chemical to be pumped in as little time as possible.

Even if Pietras was not aware that the Lincoln barrel pump would be used specifically, he knew that Tharp was having issues with the rate of flow with the original pump used and his original recommendation provided that a large volume of chemical could be added all at once. The Estate argues that if Pietras did not know that a large volume pump which was going to increase the rate of flow was being used, he should have known based on Pietras' admission in his deposition of the discussion with Tharp about the pump issues. (Filing No. 175 at 14.) The Estate argues that actual knowledge or what the defendant should have known is sufficient to demonstrate negligence. *Id.* "[C]ircumstantial evidence may suffice to generate a genuine issue of material fact." *Culver v. Roberts,* 192 F.3d 1095, 1099 (7th Cir. 1999).

Although, "[t]he mere performance of coordinate or duplicative functions will not suffice" for creating an assumption of duty, it is clear and undisputed that ChemTreat assumed a duty to be Quaker's water application expert at a bare minimum. This is evidenced by a contract and

---

[11] The Lincoln barrel pump was installed after Tharp unsuccessfully tried to introduce Onyxide into the system using a different pump that handled a lower volume.

ChemTreat's ongoing visits to General Motors' Plant to analyze the water and provide recommendations on the water in the welder water system. Even if ChemTreat did not play a role in the *manner* in which Onyxide was introduced into the system, it still provided the recommendation that Onyxide could safely be used in the cooling tower loop and added all at once. This recommendation should have involved consulting the MSDS for an assessment of the other chemicals at a minimum. The MSDS is the primary source to use when looking at issues of chemical compatibility. It is undisputed that a root cause of the explosion was the incompatibility of Onyxide 200 with C1288, which was intensified by the rate of an upstream flow and large barrel pump used to introduce Onyxide into the system. Because ChemTreat undertook the same duty that Quaker alleges that it breached—failing to warn about the incompatibility of the chemicals—summary judgment is not warranted. Quaker relinquished control over the water application aspects of the welder water system evidenced by Gibson seeking subject matter advice from Pietras regarding if Onyxide could be used in the system with the other chemicals present and dosage recommendations. This was an essential part of the decision making process to introduce and use Onyxide in the cooling tower system. For these reasons, the Court **denies** ChemTreat's Motion for Summary Judgment ([Filing No. 145](Filing No. 145)).

## IV. CONCLUSION

For the reasons stated herein, Defendant Caravan's Motion for Summary Judgment (Filing No. 136) is **GRANTED**. Defendants General Motors' Motion for Summary Judgment (Filing No. 141) and ChemTreat's Motion for Summary Judgment (Filing No. 145), are **DENIED**. The Estate's claims against General Motors and ChemTreat remain pending for trial.

**SO ORDERED.**

Date: 12/1/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Evan K. Hammond
GLICKFORD, HAMMOND, MYERS
  & BREWER, LLP
ehammond@dglickfield.com

William T. Myers
GLICKFORD, HAMMOND, MYERS
  & BREWER, LLP
tmyers@dglickfield.com

Nicholas Ward Levi
KIGHTLINGER & GRAY LLP
nlevi@k-glaw.com

John F. Townsend, III
TOWNSEND & TOWNSEND LLP
townsendlawfirm@aol.com

Jennifer Van Dame
KIGHTLINGER & GRAY LLP
jvandame@k-glaw.com

Steven Edward Springer
KIGHTLINGER & GRAY LLP
sspringer@k-glaw.com

Hal A. Shillingstad
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
hal.shillingstad@ogletreedeakins.com

Patrick F. Mastrain, III
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
patrick.mastrain@ogletreedeakins.com

Stephanie J. Willing
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
stephanie.willing@ogletreedeakins.com

Ian P. Goodman
CANTRELL STRENSKI MEHRINGER
igoodman@csmlawfirm.com

James P. Strenski
CANTRELL STRENSKI MEHRINGER
jstrenski@csmlawfirm.com

Keith D. Mundrick
CANTRELL STRENSKI MEHRINGER
kmundrick@csmlawfirm.com